[Civ. No. 10128. First Appellate District, Division One.—April 28, 1937.]

F. ADAMS, Appellant, v. DOLLAR STEAMSHIP LINES, LTD., INC. (a Corporation), Respondent.

H. W. Hutton for Appellant.

Irving H. Frank, Nathan H. Frank and L. Charles Gay for Respondent.

KNIGHT, J.—Plaintiff appeals from a judgment entered in defendant's favor pursuant to an order granting defendant's motion for nonsuit.

The action was for damages arising out of a permanent sickness contracted by plaintiff while in defendant's employ as a seaman aboard the ship "President Garfield" on a voyage around the world. The voyage began and was to have ended in San Francisco, and the route followed was via the orient, across the Indian Ocean, through the Suez Canal, and across the Mediterranean Sea to the United States via New York; thence on to San Francisco by way of the Panama Canal. On the night of May 28, 1930, the ship sailed from Marseilles, the last port of call before reaching New York, and soon after it passed through the Straits of Gibraltar plaintiff was taken sick; but he remained in the ship's hospital for only four days and then resumed his regular duties. The ship arrived in New York on June 10th, proceeded to Boston on June 12th, and returned to New York on June 16th, and remained there until June 20th, when it sailed for the west coast. A few hours before its departure plaintiff while working on deck was taken violently ill and sent to the United States

Marine Hospital at Stapleton, Staten Island, New York, for treatment. After being examined he was instructed to return in three days, at which time he entered the hospital as a patient. His case was tentatively diagnosed as acute gastritis; subsequently it was changed to food poisoning, and later, after extensive laboratory work had been done, it was ascertained he was suffering from typhoid fever. On July 19th he was operated upon for intestinal perforations produced by typhoid ulcers. This was followed by an attack of pleurisy. He was released from the hospital on October 27, 1930, and remained in New York until November 6th, awaiting transportation by ship back to San Francisco. On his arrival in San Francisco he went to his home in Seattle; but in March, 1931, returned to San Francisco to enter the Marine Hospital, where it was found he was afflicted with pulmonary tuberculosis. He remained there until July, 1932, and was then sent to the tuberculosis hospital at Fort Stanton, New Mexico. After being a patient there twenty months he returned to his home in Seattle, and remained under medical treatment until February, 1935, when he returned to San Francisco to attend the trial of this action. At that time he was still seriously ill and unable to perform any kind of work.

Under the shipping articles pursuant to which plaintiff was employed, defendant agreed to furnish the crew with proper food and water, and plaintiff's cause of action was based upon allegations that defendant ''failed so to do but on the contrary carelessly and negligently furnished putrid food and water contaminated with some bacteria . . . capable of conveying typhoid fever germs''; that plaintiff partook of said food and water, and as a result thereof contracted typhoid fever.　　There is ample evidence to prove that plaintiff's pleuritical and tubercular ailments were the outgrowth of the typhoid fever with which he was originally stricken; therefore the principal question involved is whether there are any circumstances shown by the evidence from which it may be reasonably inferred that the typhoid fever was traceable to the ship's water or food. If so, and regardless of whether it appears also that he may have contracted the disease from other sources, the court erred in taking the case from the jury.

According to the medical testimony, typhoid fever is an acute infection of the intestines, caused by typhoid germs taken into the system by drinking water contaminated with

sewage; also by eating uncooked food contaminated with such polluted water. The germs may be taken into the system in various other ways, for example, by touching the lips with the hands or with eating or drinking utensils or other articles which have contacted typhoid germs. The germs may be transmitted also by a so-called typhoid carrier, that is, a person who has had typhoid fever and completely recovered, except that the germs remain alive, usually in the gall bladder, and these people pass out the germs in feces and contaminate food and sewage which gets into the water. The medical testimony further shows that the incubation period of typhoid fever is fourteen days after consuming the germs. Some cases, the "walking type", may go a little longer, but two weeks is the average. Furthermore, it appears from the medical testimony that typhoid germs are quite prevalent in all Asiatic ports, and to some extent in many other foreign ports; that typhoid fever is a preventable disease, and may be avoided by drinking only boiled or distilled water and eating only cooked food.

The "President Garfield" was used altogether for round-the-world cruises, each trip consuming approximately four months. The ports of call were Honolulu, ports of Japan, Shanghai, Hongkong, Manila, Singapore, Penang, Colombo, Suez, Alexandria, Naples, Genoa, Marseilles, New York and Boston; thence back to New York and on to San Francisco via the Panama Canal, stopping at ports en route. The ship's water supply, for both passengers and crew, was carried in six large tanks, and on each trip two of these tanks were emptied and cleaned, one at Shanghai and one at Singapore, the work being done by resident Chinese labor. The work consisted of scaling the cement coating from the inside of the tanks, and then recoating them with cement. The water supply was replenished as needed at different ports of call. On this particular trip it was taken on at every port of call except Shanghai. The ship was provided with evaporators for distilling water, but they were intended to be used only in cases of emergency, it being cheaper to buy the water than to heat steam to evaporate it. Before taking water at ports of call the ship's doctor ascertains from the public health doctor at the local port whether the water is suitable, and if it is the chief engineer is directed to fill the tanks. As to the food used on the voyage, there was no evidence introduced

showing where or under what circumstances it was obtained; but it was shown that passengers and crew ate the same food.

The ship sailed from Manila on April 22d, and when about four days out serious sickness developed among members of the crew, so that by the time the ship reached the Gulf of Aden, some two or three weeks later, there were fifteen or sixteen crew patients in the ship's hospital. No complaint was made about the ship's water; it had no bad odor, and was always fresh. But soon after leaving Shanghai complaint was made to the captain by certain members of the crew about the food. It was claimed that it was not only putrid, but improperly cooked; and after the ship entered the Red Sea the ship's doctor also complained to the captain about the matter, saying that there must be something wrong because of the increasing number of cases of sickness among the crew; and the doctor demanded that he be allowed to inspect the refrigerator where the food was kept. After having done so, and at his direction, certain quantities thereof consisting of meats, cheese, and other foodstuffs, were thrown overboard. The federal law (sec. 201, tit. 46, U. S. C. A.) required entries to be made in the ship's log of every case of illness or injury happening to any member of the crew, with the nature thereof and the medical treatment, and provided for the imposition of penalties for noncompliance with said statutory requirements, but no such entries were made; consequently, aside from the cases of two members of the crew, named Hamilton and Seligman, who were witnesses at the trial, the evidence does not show the names of the crew members who were sick on the voyage, the diseases with which they were afflicted, nor the duration thereof. When the ship arrived in New York, four members of the crew, besides plaintiff, were sent to the Stapleton Hospital on account of sickness. Two of the cases were definitely diagnosed as typhoid fever. The other two were treated for deviation nasal septum. One of the four was Hamilton. The names of the other three were not revealed. Seligman also quit the ship at New York on account of sickness; but he went up to Cape Cod to stay with a friend, and there recuperated. Whether Hamilton was one of the two afflicted with typhoid fever does not appear. He stated at the trial that he was, but on defendant's motion his statement was stricken out as being his conclusion. No effort was made to prove the disease from which Seligman suffered. But

there was a marked similarity of symptoms between their cases and the case of plaintiff, such as high fever, loss of appetite, severe headaches, diarrhea, weakness, and great loss of weight. Hamilton and Seligman were stricken about the same time, just before the ship entered the Red Sea. Hamilton remained in the ship's hospital until the ship reached New York. The next day, June 11th, he was sent to Stapleton and there remained under treatment for two months. Seligman, on account of so many of the crew being sick, was put to work half time after leaving Marseilles. But as stated he quit the ship at New York. At that time he was extremely weak, having lost forty-five pounds in weight since leaving Singapore.

With respect to plaintiff's illness, the evidence shows without dispute that the typhoid fever with which he was stricken manifested itself in violent form on June 20th. Therefore, since according to the medical testimony the incubation period for the disease is fourteen days, it would follow, as plaintiff contends, that he became infected with typhoid germs aboard ship while it was crossing the Atlantic Ocean. In that state of the evidence, and taking into consideration all of the facts and circumstances hereinabove set forth surrounding the large number of cases of undetermined sickness which developed among the crew between Manila and Suez, it is our opinion that plaintiff established a *prima facie* case, and consequently was entitled to have the question of whether his sickness had its origin in the ship's water or food submitted to the jury.

In support of the trial court's ruling defendant points to evidence showing that plaintiff was ashore at every port of call on the voyage except Penang, and that while ashore he ate and drank freely and associated indiscriminately with local inhabitants; that other members of the crew also were ashore at different ports of call; and that plaintiff slept in a forecastle with three other sailors, one of whom was Seligman; and it is argued therefrom that plaintiff doubtless picked up the germs while ashore, or perhaps from some member of the crew who had been ashore. But even so, if, as seems apparent, the facts and circumstances above related are sufficient to justify the inference also that the ship's food or water was responsible for his illness, the determination of the question of the origin of the disease should have been left to the jury.

And in this connection plaintiff in support of the claim that there was something wrong with the ship's drinking water, calls attention to the evidence showing that Hamilton was ashore only at Honolulu; that thereafter, while aboard ship, he drank the ship's water from the tanks, and that it was many weeks after the ship left Honolulu that he was stricken; that on the other hand another sailor named Ahern, who was also a witness at the trial, was ashore at every port, but while aboard ship drank only distilled water from the coffee urn, and that he was not sick at all.

Defendant points out also that according to the medical testimony putrid food does not of itself germinate typhoid germs and consequently does not cause typhoid fever, unless of course the food had contacted water polluted with such germs and is not properly cooked; and it is argued therefrom that the ship's food could not have been the cause of plaintiff's illness, even conceding that some of it was spoiled. The evidence does show, however, beyond question that prior to the time the putrid food was dumped overboard a large number of the crew were made seriously ill; and therefore, since there is no evidence in the record showing that the illness from which they suffered was not typhoid fever, it cannot be held, as a matter of law, that no part of the spoiled food was infected with typhoid germs. The question, in our opinion, was one of fact for the determination of the jury.

Defendant further contends that in any event it was impossible that either the food or water was infected with typhoid germs because if either had been there would have been a general epidemic of typhoid fever among the passengers and the crew. No doubt that is true, but so far as our attention has been called there is no evidence showing whether or not any of the passengers were made ill on the voyage; or if so how many; and in regard to the crew, as stated, owing to the failure to comply with the law requiring cases of sickness and the nature thereof to be entered in the ship's log, it cannot be held as a matter of law that the fifteen or more who were made ill on the voyage were not typhoid cases.

Finally, defendant contends that plaintiff's action is founded on a federal law known as the Jones Act, which requires proof of negligence in order to recover damages; and that therefore even though the evidence herein be deemed

legally sufficient to justify the inference that the ship's food or water was the proximate cause of plaintiff's sickness, no recovery may be had because there is no evidence of negligence on the part of defendant. Plaintiff evidently takes the position that the action is not based on negligence, but is one for breach of contract to furnish proper food and water, and that consequently proof of negligence is not essential. However that may be, the evidence shows that typhoid fever is a preventable disease, and that the means of prevention consist in boiling or distilling the water, and thoroughly cooking the food. Here, admittedly, the drinking water was not boiled or distilled; and evidence was given to the effect that the food which was served to the crew was not only spoiled but "wasn't cooked properly". Consequently, assuming that the element of negligence was involved, it was a question of fact for the jury to decide whether under all the existing circumstances the omission on the part of defendant to take the preventive measures mentioned constituted negligence.

We are not to be understood as expressing the opinion that plaintiff did contract his sickness from the ship's food or water. As contended by defendant the evidence shows a number of sources from which it may have had its inception. We hold merely that the evidence discloses circumstances sufficient to support the inference that the ship's food and water was among those sources, and that therefore the determination of the true origin of plaintiff's sickness should have been left to the jury.

For the reasons stated the judgment is reversed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on May 28, 1937.